Good morning all we will be hearing one case this morning and that is a Whittaker Clark and Daniels and we will be consolidating and hearing at the appeals in 24-2210, 2211, and 25-1044. So we will begin with you, Ms. Harden. Good morning, Your Honors, and may it please the Court. I'm Kathleen Hartnett from COULEE on behalf of the Official Committee of Child Claimants. We appreciate the Court expediting consideration of the matter and we look forward to answering your questions today. I reserve five minutes for rebuttal. Granted. Unless the Court would like to proceed otherwise, I will first address the appeal of the motion to dismiss ruling and then address the summary judgment order. At the outset, I did want to provide some critical context for both appeals just to make sure the record is clear. The debtor here, referred to as WCD, was subject to a receivership order that came out of a South Carolina personal injury lawsuit where there was a $29 million jury verdict. We're pretty familiar with the facts so you can just go straight in. Well, I think that the key point I'm going to make, and I just make it in the point of the legal points for each ruling, is that this was an effort to evade an order that was issued by the South Carolina court and to bring a bankruptcy. We understand your perspective on that. I wonder if you might start with addressing the last question that the Court put out to the parties on the applicability of faxing and whether that approach to conflict of laws provides a more straightforward approach to deciding whether we're looking to New Jersey law for resolution here. Thank you, Your Honor. We appreciated the question. I think there is, you've identified a split regarding whether faxing the choice of law rule of the form applies in a bankruptcy case. With some courts on one side and some courts on the other, we can talk about that. We're not aware of any case that did not apply the state of incorporation to a dispute about whether the party was authorized to bring the bankruptcy, other than there was one DNAS bankruptcy case from 1982 that appears to have provided the, that's called In Re Autumn Press, where the court looked to the form state's choice of law rules to determine the applicable law. I think what the cases appear to do in the context of whether there's authority for the bankruptcy is apply the state of incorporation. And so I think it's important, we're not seeking to apply South Carolina law in this proceeding. What we are trying to do, and I think maybe this could be more, even more clear as a first principle, is to apply, have that order from South Carolina law in effect in this case under New Jersey law. So I don't think we dispute that New Jersey law is the starting point in terms of was this authorized. Had that South Carolina in that case never happened, there would be a board of directors of a company that could come in and that would be an authorized filing of the bankruptcy. Our position here is under South Carolina law or New Jersey law that this, the order from the South Carolina court displaced the background principle that would be the board having the authority to file. What was the authority under South Carolina, Carolina law for entering the receivership order? So your honor, there was a state receivership provision that the courts. Yeah, I think it's what, 15, 65, 10, whatever it is. Pre-judgment and post-judgment. And it seems to give the court authority to take, have a receiver appointed of the property within the state of foreign corporations. So that sounds like an asset order, which is indeed that's what was entered. If that's the case, then what determines, how can that order determine whether the board has the authority under its state of incorporation law to file a bankruptcy in that state, in a bankruptcy court in that state? I understand your question, your honor, and I really would like to answer it and make clear what could have happened and should have happened. So the court in South Carolina did, unlike some of the other South Carolina receivership orders, which were limited to insurance proceeds, purported to put under the receivers control all of the assets. And there's the stipulated facts underlying the motion to dismiss that make clear that all of the assets of WCD were intangible. There's not a building, there's not property in New Jersey. It's intangible. The court did reach the conclusion in South Carolina, applying South Carolina law, that it believed that there was power within South Carolina to attach or to put within the receivers control all intangible property. And that was under the San Gamo case, which we're not trying to re-argue here, that's a South Carolina Supreme Court case. And they also, under South Carolina law, that it could be displacing the board. So the South Carolina court believed it had that authority. Where in the order does it attempt to say that the board's authority to file for a bankruptcy or to control this internal affairs, if you want to be more broad, is something that's covered by an order that deals with assets? I will answer your question if I could. I just want to make one more point on the assets piece and I will answer your question about the order, because it doesn't directly say that. It says it in general terms, not specific terms. But I think what's interesting and important here is that the order did give the receiver, and you're familiar with the record at JA 217, the power and authority to fully administer all assets of WCD. And that was right after discussing the insolvency issue. But then your brief on page 21 says, it's authority to manage the assets and corporate affairs. And I just can't find where that was. It looks like the judge here was very careful. She wanted to stay away from trying to get involved in that, even though counsel asked her to do so. Your Honor, I would, so the additional language that gives the additional power is to take any and all steps necessary to protect the interests. And I really would focus the court on the first day declaration that WCD filed on the bankruptcy made clear that what they wanted to do was to most effectively administer the remaining assets. So the effort to file bankruptcy was in direct conflict with the power that had been given to the receiver. And to your question of whether or not the order, unlike other orders in South Carolina, there are two cases currently up on appeal in the South Carolina Appeals Court. Supreme Court just heard argument on them. We discussed them in the brief. That's a receipt, those are at issue, a receivership order, different cases, where the debtor actually went to appeal them and said, this is too broad. In that case, it was limited to the insurance assets. Here, the order was broader. And I would respectfully submit the answer to that was to appeal that case to the South Carolina Supreme Court, as these other two parties did, to seek relief if they thought this was wrong under South Carolina law. But the court did intend that. I agree the first order is broad. Okay, no word of bankruptcy. It comes right after a discussion of insolvency, so we know that that was the concern. And then because the debtor did not at that point have a briefing, the court gave the debtor that chance. We have the reconsideration motion in the record. And I really, I'm sure you've looked at this, but I would commend to you the full transcript of the reconsideration hearing, the portion about that. There are some other post-trial motions that were addressed. And this is at JA 417 for several pages. It's actually 40 pages of, it's a mini, so 40 pages of transcript where the court went back and forth with counsel at the reconsideration hearing and reaffirmed that, yes, like it or not, she had intended for that first order to limit the ability for some other group other than the receiver to file for bankruptcy. She was somewhat concerned that an amorphous organization might file for bankruptcy. But that concern or statements stated at the hearing didn't result in a revision of the receivership order and at the prior month. Your Honor, again, I think it's pretty clear from looking at the transcript, at least to me, I would respectfully submit, that the court there reaffirmed the breadth that she had initially intended. She made clear that the reason for it was the bankruptcy. And then she, on the record, denied the reconsideration. MS. GOTTLIEB I'm sorry. Now, do you agree that there's a distinction to be made between corporate assets and its affairs? MS. TAYLOR Right. Your Honor, I don't think so actually in this situation. The power to manage the assets is, it requires the ability to manage the corporate affairs. That is what the court thought she was doing. She may have been mistaken under South Carolina law, but that is what she thought she was doing. MS. GOTTLIEB Even under South Carolina law, looking at Section 33-14-320, it seems to make a clear distinction between their receivers and custodians. Receivers are able to control assets of the corporation, and custodians have the powers of the corporation through or in place of the board of directors to the extent necessary to manage the affairs of the corporation. Under South Carolina law, explicitly, it seems to recognize those distinctions. And I wonder how broad you would go with this. Is the idea that this receiver, for example, would be in a position to amend the bylaws of the corporation, to mergers? MR. GOTTLIEB Those are fair questions, Your Honor. The one thing we know is that the court in South Carolina gave the receiver the powers that were adjacent to managing the assets with respect to the filing of bankruptcy. And I think that is really important. It doesn't say with respect to the filing of bankruptcy. And the filing of bankruptcy, that sort of decision seems classic, a matter of internal affairs. It also doesn't strip the director's authority to petition for Chapter 11 or manage the corporate affairs. And it also assumes that that kind of control is an asset that the receiver could possess, which also doesn't seem right. In other words, I understand. I think we all get it. But it doesn't seem that that's what actually happened in the South Carolina proceeding, nor is it something that's contemplated under South Carolina law. So why isn't this just a simple matter of the South Carolina court entered what it did? It doesn't extend to corporate control of this matter. MS. GOTTLIEB Your Honor, if it didn't, I understand the point. I think the problem here, honestly, is that this is a very broad order of a South Carolina court. We just have to, I mean, it's not void. It was issued, but duly issued. So it is a problematic order from WCD's perspective. And I understand why the panel is strained to believe. Did this court really intend to do that? But I would say she did. She did it in the broad language to start, and then she reaffirmed at the hearing that's what she intended. And then she entered her denial of the reconsideration motion on the record. The reason why WCD was so upset about the order was that it recognized that it was purporting to divest the bankruptcy power. And then it's just really critical that instead of participating in good faith, what the judge did, and I think this is clear from the reconsideration transcript, in South Carolina she said, okay, I'm denying it. I'm sorry. I hear you, WCD. I'm worried about some amorphous bankruptcy. I'm denying that the receiver has this power. But I'm going to give you a week to prepare proposed orders, because I know this is going up here, and I'd like you to comment on the proposed order from Plaintiffs, who just won. And then instead of participating in that process in good faith, they went and retained counsel to make a bankruptcy. I just think that that has to be considered. As soon as we get into the interpretation of the order and of South Carolina, we raise the specter of a Booker Feldman and constitutional issues. Why don't we step back to first principles, what I was asking you at the outset? And that is, why shouldn't we just look at the choice of where, if it's pointing us to New Jersey, and you seem to agree it does, we have New Jersey law as the default of the authority of the board. Why aren't we then looking to New Jersey law, too, for when that power can be wrested from the board? I don't think that WCD has identified anything contradicting the point that the order from the South Carolina court, assuming it's duly issued, is able to displace that. That's an order of a court saying the receiver now has the power to manage the assets. That is inconsistent with the board filing for bankruptcy. Well, but New Jersey makes provision for that, right? I mean, just because there's an interest by a foreign court doesn't mean you can dispense with all of the procedures that New Jersey put in place if we're looking to New Jersey law. Well, the main procedure they've pointed to is the ancillary One is it's not an ancillary receiver. This person is now, Mr. Protopappas, is the primary receiver. But if an ancillary receiver were appointed to aid Mr. Protopappas, would that have not strengthened your case? Your Honor, it probably would have. I believe our view is that it would have possibly strengthened it. We were doing everything we could to assure if New Jersey law was not necessary. It also wasn't possible. Mr. Protopappas was waiting for WCD to provide comments to the proposed order on the 27th of April. And the day before that was to happen, everyone waiting, including a judge in South Carolina who is a former Supreme Court Justice of South Carolina, a respectable figure. She wasn't making straight offhand remarks. She was giving this party a chance for fair and due process. And instead of that, Mr. Protopappas had no notice that was happening. He was assured by the reconsideration hearing that he was going to have time and that there wouldn't be a surprise bankruptcy. But doesn't that beg the question? I mean, if we are looking to New Jersey law and the default is that the board has the authority, the debtor can go and can file that petition, then the timing of them doing that is within their discretion. Right? Were there authority? At that point, they did not have the authority. That's our position is that the receivership order divested it. If there was some ambiguity about what the receivership order meant, the judge clarified it at the reconsideration hearing. And so the board essentially at that point knew that it had what was purporting to be an order from a South Carolina court not giving that power to it. So what it did was very quickly in the time of a week pulled it together to be able to file the bankruptcy. And so I think that our point is simply it's not that this receivership order is valid for all time. It's also one specific receivership order. We're not arguing about receivership orders writ large. It's about this one. And if this one was problematic because it gave too much power to Mr. Proto-Papas, the correct answer was to appeal that just like these other parties have done. And there's actually, so that's both the tip case and the relationship. I guess I'm still lost why it's the correct answer. I mean, it seems like the other correct answer is that the board is free to do as it shows. I mean, I understand, I understand you resist that conclusion, but it certainly wasn't, I mean, it has to be that if that isn't what the order said, then WCD's board of directors was free to proceed as it did in the pictures. The default rule would be they are free. The point is, the question is really under the bankruptcy, but that's why we don't need to get to Rooker Feldman because there's a separate statutory prerequisite, which is that the bankruptcy be properly before the court and not have a reason to dismiss it for cause. Just to be clear, when we first moved to dismiss, so Mr. Proto-Papas moved to dismiss below, there were two counts to that. One was unauthorized bankruptcy because Proto-Papas had the authority. Two was lack of good faith. The parties negotiated to remove the second argument, the good faith, to speed things along and get that rolling. We have not, I don't think anyone on our side has said there's been good faith or not said we have the ability to make that argument. There is something problematic about the course of events here. I think we thought the most straightforward way to argue the point is that that order had digested the board, but it certainly is in conflict with the board. Even if you want to say, and we appreciate the point, if the order just is limited to controlling all the intangible assets, but maybe not issues of actual internal affairs in the sense of being able to file the bankruptcy, then maybe the right answer was that WCD would have to at least check with Mr. Proto-Papas before it did that and get some, the conduct of the board cannot be reconciled with the receivership order. I don't think you even need to reach the question of how broad that authority was. It's clear that that order has been contravened. Then the question is just, okay, what do we do about that? It seems that the order of the South Carolina court dealt primarily with assets, at least primarily, and accepting of service and other things that went with that. The order of the decision and the order of the court in New Jersey was who has the authority to file for bankruptcy. If you're looking at Rooker-Feldman on fourth step, that would seem to be that there are two very different issues. If there's one thing we know from Exxon Mobil and its progeny in the last 20 years is that Rooker-Feldman is now essentially confined to the Rooker case and the Feldman case, and not a whole lot more. I don't understand how you can make an argument on Rooker-Feldman that's going to carry the day. Your Honor, we actually, when we first came to this matter, thought the same thing, that Rooker and Feldman were standing alone. It's actually not the case, and we've identified some cases in the bankruptcy context, including Monroe Heights, Arista, Jenner, and KPLC, surprisingly, but maybe not that surprisingly, where bankruptcy courts have encountered this phenomenon, not in the authority context, but in other situations where within the bankruptcy proceeding, someone is trying to clear what was happening in the sense that there was no contemplation of bankruptcy by, this is in the record, by looking at the board minutes and the other documents we had, there was not a contemplation of bankruptcy that had been infill at that point. Until the receivership order drops, we're going to move for reconsideration at the same time. Essentially, your argument would be, and I see it in some of the cases post-Exxon, and I saw it in your brief, that somehow what happened in New Jersey is inextricably intertwined with what happened in South Carolina, but is that the law anymore in light of where the Supreme Court has told us to look at Rooker-Feldman in the most narrow way possible? Your Honor, we do think we've set aside the four elements as we set forth in the brief, because I think the thing at the end of the day that helps gel it, and I really did juxtapose, the order says, Receiver, you have the power and authority to fully administer all assets. In the sworn first day declaration and the request for release in the bankruptcy court, the debtors seek to most effectively administer their remaining assets. Power to do assets, we're coming to you because we are trying to have you control our assets. It's challenging. We're in a bind. We have a judge in South Carolina that is using the authorities that she believes exist to her, and we have two parties that are killing them in the South Carolina Supreme Court. There's actually a cert petition from the certain underwriters of Lloyd's. It's just in case we didn't put this in our brief, but it's 24A802. There's some other people that don't like what she's doing that are now recently got an extension from Chief Justice Roberts to do a cert petition on this. So that is the place to go with the complaint. I guess my final question on this particular subject. Yes. Is there any authority? I mean, obviously, you're arguing from the order itself, the receivership order, but any authority that foreign receivers may enter New Jersey and conduct the affairs of a New Jersey corporation simply by virtue of a lower state court receivership order dealing principally with assets? I am not – no, I don't think so, but I'm going to take that back and reply. We'll try to have an answer for you. Okay. Wouldn't that run straight into the equal sovereignty principle? These are two sovereign states. This is a corporation in New Jersey that is incorporated under New Jersey law. It has its own board. It's governed by the procedures that New Jersey has laid out for both the powers of that New Jersey board and how to divest them. And you're suggesting a lower court judge in a different state can come in and take over all the internal affairs of the corporation without any limits that you've articulated for us? Your Honor, I hear your question, and I understand the concern. I think this is – one, this is a company that's not been – it's been defunct. It's not an operating company. All it has are intangible assets. So I think this would be an entirely different case if a court had purported to take over real property in the state or something like that. That's not happening here. But more importantly, I don't think you need to reach the issue of – the one thing we can tell from her order, and I just continue to juxtapose what she said the receiver has versus what WCB thought it had and was bringing to the bankruptcy court, the part of controlling the assets is in conflict. And it seemed to us and it seemed to the court – at least the court seemed to in South Carolina that was related to the bankruptcy power, i.e., a receiver has been appointed that will preclude some other group from filing for bankruptcy. That's what she thought. And so at a minimum, the bankruptcy power here, the filing, was not consistent with that order. And it should have been. At minimum, I think we believe it gave the receiver more power. That's certainly the receiver's counsel here. That's their position. But at a minimum, WCB should not have been able to file for bankruptcy in New And so there are sovereign issues, but there's also the issue of respecting a sister state's court order until it's otherwise stayed or repealed. No stay was sought. That would have been the right thing to do. Come back to the judge, say, Your Honor, we hear you on the reconsideration, we're about to file for bankruptcy. Can we please get a stay of your order? We need to do that now. That would have been the right way to handle the situation. The wrong way is to pretend to participate in the South Carolina process and then file a bankruptcy that they know is contrary to the order from the court. Do you agree that South Carolina as well follows the internal affairs doctrine in terms of choice of law? In terms of what, Your Honor? In terms of choice of law. Oh, yes. I don't think we have a... I think that the two jurisdictions are the same in that respect. It really is more of a decision about whether or not... The problem here is whether the South Carolina court erred with respect to the breadth of the receivership order. As we do have some time this morning, you'll be on our time. I was trying to tell you why we should... We've kept you on this. No, I appreciate it. We want to address the whole issue, obviously an important one, but why don't we give you time to move on to the special liability question? Yeah, thank you, Your Honor. So turning to the summary judgment ruling, of course, we want to mostly answer your questions. I think the two main points I wanted to leave the court with is that we are not arguing for the evasion or disregard of Emeril. We're arguing for its application, and we can talk about that a little bit more. The second point is that the Section 544 argument here is novel and would be inconsistent with decades of practice, and we believe should be rejected. Just starting with the Emeril case, I think there's been various, both in the opinion below, but also some of the briefing, just excerpts or snippets, and I just wanted to articulate what we believe the test is under Emeril, which is not at a whole cost. That derives from Foodtown, which itself derives from the Supreme Court's ruling. Before you get to that, it seems like these facts are remarkably similar to the facts in Emeril. They are, Your Honor. Dicetal claimants are trying to make a claim saying that it's personal, and the court says, no, it's not, and it's basically property of the estate. My blink response is what you're really asking us to do is to go and bank and somehow overturn Emeril. Your Honor, we've reserved that argument, but I really, if I can move away from the podium with one thing clear today, we are not asking this panel to overrule Emeril in applying it to reject the notion that the product line claim and the California state law claims should not be just swept into the state property, and it's for two reasons. On the product line claim, that was in the arguments before the court in Emeril. First of all, Emeril, by its terms, is mere continuation claims only. Those were something that the Emeril court underscored or could have been no, so a claim for injury is personal. It's to the creditor. Other creditors generally have no interest. Where all creditors can bring a claim, then that's general. That's essentially the holding, that part of Emeril. A product line exemption claim is not available to every creditor. It's available to personal injury claimants where the successor entity continued to manufacture the product, and I just really must emphasize that we pointed to the oral argument transcript in Emeril, and I know that's not the opinion. That's the oral argument, but there, the counsel for the debtor, which was represented by the same firm as in the bankruptcy in this case, said that if they were bringing a product line exemption claim, that is not a successor liability claim that could be brought by all creditors, and they actually even filed a post-argument letter in that case, and that's not cited in our brief, but it's at the Emeril docket. It was filed in October of 2013. It said nothing in federal bankruptcy law prevents the plaintiffs from pursuing individual successor liability claims like a product line claim, so I think Emeril was being really careful about what it decided and what it didn't, and before the court that day was a... But you also have Wilton after that. We do, but there is this example of a case where the code actually gave the right to bring the state law claim. So I really, I think, again, I think it would actually, so Emeril did not, by its four corners, resolve the case, and we're just trying to apply the test that was set forth there, which is not, again, not a full cloth, but based on precedent, and the point there makes sense. It was like, does the debtor have a right to that claim under state law or federal law at the time of the bankruptcy, and is it something general or personal? Yes. Well, when you go to understand what it means to be general or personal, haven't we, and this is in the context of our sister circuits as well, moved away from something that's looking at the individual claimants or individual claims. We're really looking at whether it's directs or derivatives. And if that's the approach we're taking, that liability is not, you know, as a result here of, you know, of anything that, you know, DECO has done or BERTA, why aren't we in the world of claims that are general because it's derivative? That just isn't the test for general versus personal that the court applied, and it makes sense because the question is whether it's one that the debtor could have asserted itself at the time of bankruptcy. And so to the extent that there's general success and something that's available to all creditors, and that simply is the holding of Emeril and under the Tronex decision in the Second Circuit, essentially that it's version of Emeril, have both made that being the key thing. Could the claim be brought by any creditor of the debtor or is it specific to some subset of the debtor? That is the nature of the thing. And so alter ego is something any creditor, here we do not only have TAL claimants, we have environmental claimants and we have various business providers of the debtor from before the bankruptcy. How do you square that with the language that we talked about in building the arm of TAL? Well, I mean, so I think Wilton underscored the point that you needed to look to the nature of the claim, not just the factual, it wasn't about the factual corpus, but what the nature of the claim was. It was whether the injury was directly traced to the defendant's conduct. But in that case, there was the ability to bring the claim under the code, which allowed for five, it was under 544B or 548. And so basically there was a code gave the right to give that claim. Had that not been the case, then that claim wouldn't have been able to. That's really not much different than Emerald. I mean, as a factual matter, what specific actions has Brentag or any other successor of Whitaker done that caused an injury to the committee's constituents? They continue to manufacture the product line after receiving. I mean, directly to them. I thought all of the injuries of the TAL claimants that they suffered were due to exposure to asbestos from products purchased from the debtor. That's correct. But the test is not simply whether or not the third party created the claim directly. It's whether or not the claim is, I mean, that's just, I'm applying what the Emerald says the test is. So I guess it could be a different test, but under what we understand to be the case under Emerald and under, and again, Wilson was a separate situation because there you actually had a code-based power to bring the claim. But when you're looking to just general versus personal, the question is, is it something available to every creditor? In Emerald, the plaintiff said, of course not. These are personal injury claims. They're personal to each of us. The court rejected that notion. That might be true of your underlying personal injury claim. But when you're simply putting in an allegation of mere continuation liability, that's something that a contract provider could say. Any debtor, any creditor could make that claim. Not every creditor to WCD could bring a product line claim. And it may seem like, okay, well, why is that the line? Well, the line is already getting encroached on. I mean, the background principle is one that creditor claims are not to be released into the estate likely. And so I think Emerald already had decided to bring in some that were arguably personal. That doesn't mean that the line just continues to go out until all creditor claims get swept in without being faithful to the underlying principle, which is that the debtor, there's a difference between what the claims are, what is the estate, and what are the claims of the creditors? That's the fundamental point here. And that's the statutory provision that we're kind of all flowing out of. If you're Brentag and you've been the defendant in an adversary proceeding brought by the debtor and you've settled up, and it's for parties that were not directly injured by your actions, your product line, why would you possibly think that somehow you're still liable to those parties after you've already ponied up money and you've got case law telling you that they need a direct action against you? Well, I mean, the case law is that there's a product line theory of liability against you. And that would be something that you would be known, these are sophisticated enterprises that exist largely for the point of making, you know, increasing the corpus of the estate and trying to avoid paying more than they need to. So these are sophisticated entities that would be aware of the product line exemption and they would only need to look to the Emerald case. It was crystal clear there was a debtor in front of this court pleading to please bring in the mere continuation claims, but don't worry, it's not going to involve the product line claims. That was said right in this courtroom. Okay, we'll put in the mere continuation claims. There was some really hard questioning. There was a defense. That was the line that the court drew. Our clients followed that law. That's good law. They pled. And in that case, Emerald, there was not a product line claim available to the plaintiff. And so our people relied on that and they brought a product line claim knowing that that would be something that would be subject to not being swept into the estate. Likewise with the California law claims here. Again, we're not trying to make up a requirement. It all goes back to the baseline point that you should have a state law property interest to drive whether something is in the estate or whether it's a creditor's claim. And that's essentially why the 544 came in was that it was inconvenient that 541 does require there to be a state law basis for the property right. And because California law does not allow for successor liability for a debtor where there is an actual harm to the debtor, 544 was essentially creating a federal, was being used to create a federal. Is there any real need even to get into 544? Is there any real need to get into 544? I mean, we think it's not applicable. I mean, and again, I appreciate that if you just look at the statutory provision itself, it's not the most clear thing I've ever read. I will agree with that. One normally thinks of 544A as hypothetical lien creditor. So you always think of a lien. Well, that's our point. I mean, if you want to not get to the issue of whether it's only about avoidance actions or some actions, and we have this in our brief, but at the end of the day, even if somehow 544 theoretically applied beyond its understood context, we're not talking about someone who extended credit at the time of bankruptcy. This was involuntary creditors, tort victims. It also didn't arise at the time of the commencement of the bankruptcy. So I think even on its own terms, 544 doesn't apply, even if you don't want to get into the debate about... Yeah, the paradigm case of 544 is unperfected security interests, for example. Right. And so you have a hypothetical judgment lien creditor that somehow comes ahead of them because the person who had the security interest created, nonetheless, didn't perfect it. Right. And I think that's how it's been understood in the bankruptcy treatises. And if people say, and it's not a straight remark, for example, in the opinion you wrote, it was a statement of what is understood to be the way 541 works, 544 works. But I think the main point here is that someone did stand up in this courtroom and say, Emerald, we're going to have a draw hard line here. Your continuation is something that everyone can bring unless we can see that as general product line is not something everyone could bring. That's an example of something that would be outside of the estate. And I think that should be faithfully seen through. And then the California law claim relies on, basically, an argument that when Emerald said, which you have to be able to bring the claim on your own behalf under state law, that he didn't mean it. I will appreciate your consideration. And any other questions, I can sit down. Thank you. Mr. Clement. Thank you, Your Honors. And may it please the court, Paul Clement, for the appellees. And I did want to start by thanking the court for its flexibility in arranging the argument today. I'm going to start with a motion to dismiss. And I really think that it becomes a very straightforward question for basically two independent reasons. I mean, one is I think there is agreement between the parties that New Jersey choice of law principles are the applicable choice of law principles. I think we can get there without even wading into the circuit split about whether Claxton applies in bankruptcy proceedings. I will confess, just for the sake of completeness, that I think the better answer is that it doesn't directly apply in bankruptcy because it's a case about diversity jurisdiction. And the logic of it wouldn't translate to federal question cases. But I don't think it makes any difference because I think whatever choice of law principles you look to, you get to New Jersey law. And you get there. It's just so obvious probably because of the internal affairs doctrine. I mean, if there were a single Supreme Court case that hadn't been exhaustively briefed here that I think gives you the answer to the choice of law question, it's probably not even Claxton. It's Edgar against Mike where the Supreme Court says internal affairs doctrine is a conflict law principle that brings you to the state of incorporation. If you get to the state of incorporation, New Jersey, for choice of law principles. By the way, that doesn't necessarily mean New Jersey law applies to everything, including like the tort claims and the special liability issues. But let's just, for purposes of the initial question of the authority to file the bankruptcy, everybody seems to agree it's New Jersey law. If it's New Jersey law, then you get to the result that there's no obstacle, no problem with this filing for two independent reasons. I mean, one, and I think this was the simple way that the bankruptcy court had to avoid all of this difficulty, is you just read the South Carolina order and you'd say it doesn't say anything about bankruptcy. Background South Carolina law suggests it doesn't really extend beyond the assets in the state of South Carolina. So there's nothing, there's no interference with the board's ability to bring the company into bankruptcy. If an ancillary receiver were appointed in New Jersey, would that have complicated things? It might have complicated things, but I have to say, Judge Amber, in the hypothetical scenario where the South Carolina receiver went to the New Jersey courts to get an ancillary receiver appointed, I think the New Jersey courts would have rejected it out of hand based on well-established law. And the well-established law is actually, as a background principle, the person who's an ancillary receiver is precisely somebody who's just in a foreign jurisdiction and has some assets in that jurisdiction that they might have some control over. The primary receiver is the one that's appointed by the state of incorporation. So I think if they had gone to the New Jersey courts on this, the New Jersey courts would have said, with all due respect to the courts of South Carolina, if they are purporting to do more than have a receivership over some assets in South Carolina, they are way out of line. Because the law on this is, I mean, you know, there aren't a ton of cases, because most states, kind of as a matter of mutually assured destruction, have a little more respect for their sister sovereigns. And they recognize, and this is reflected in the restatement of Conflicts of Law, second 367, is about receiverships and the choice of law principles. And what those principles lay down is exactly what your intuition tells you, which is New Jersey is the one that decides if there needs to be a receiver when it comes to the absolute control of the corporation. And the role of a foreign sovereign in appointing an ancillary sovereign is limited to the territory of that foreign state and to some assets are in that foreign state. And if you look at every statement, like, you know, there are a couple of hard questions if you have a corporation where it's incorporated in state A and all of its assets are in state B, and state B imposes a receivership, like there might be some question there as to what happens. But in a case like this, where state A is the state of incorporation and state B just has one or two tort claims in front of it and no tangible assets in front of it, I mean, it's just not a close case. So I think hypothetically, if they'd gone to New Jersey, New Jersey would have said, with all due respect, you know, this isn't even close. Of course, the New Jersey corporation gets to decide whether it's going to go into bankruptcy. New Jersey Law, though, is reasonably clear that you have to take that step of going into New Jersey and essentially getting some kind of primary ancillary receiver appointed by New Jersey for the New Jersey chartered corporation. Didn't happen here, so under New Jersey Law, that South Carolina order, to the extent it purported to do anything more than address the assets in South Carolina would be a non-starter. But of course, and I think this was the impulse of the bankruptcy judge, like I agree with you, Judge Ambrose, I don't think there is a serious Rooker-Feldman issue here, but I think the bankruptcy judge is looking at this and saying, I don't want to get into that second. So I'm just going to read this order on its face, and if you read the order on its face, particularly under the background assumption of that South Carolina statute that authorizes it, which authorizes it vis-a-vis property in the state, then the bankruptcy judge reads that and says, well, there's just no problem here. And if I could say one other word on this before I move on to the merits or whatever else the court wants me to go, the threat to the bankruptcy system of this kind of order read in the robust way that my friends want to order is very palpable. Because if you're a South Carolina judge and you have one tort claimant in front of you, like you're really interested in that tort claimant getting paid. And so, and you're not really interested in the broader interest of any other creditor and what's going on with the company. And this case is a perfect illustration. There are numerous tort claimants in New Jersey and other places. There's one or two in South Carolina. So a South Carolina court with its, and I say this with all due respect, the parochial interests of the one tort claimant in front of it might be tempted to say, I'm gonna interfere with federal bankruptcy policy by making sure that the plaintiff in front of me gets paid. But of course that's, we can't have that in our bankruptcy system. And I will note just parenthetically, this is not an isolated order. Maybe the way this one's written is a little different, but the same judge has done this multiple, multiple times, including to a company that we cite this in our supplemental brief in a footnote, but including to a company that is chartered in the United Kingdom. And the British courts weren't overly persuaded by the South Carolina's courts ability to dictate the management of a UK corporation. I can tell you that. And I think the New Jersey courts would have the same view. And while it may be possible that we could have appealed that order, I don't think we had to. I think we were perfectly within our rights to file this bankruptcy. And I don't know the facts of those other cases. They may have appealed because they may not have had an issue with solvency and going into bankruptcy, in which case, of course, they would file an appeal for an order they thought was erroneous. But I don't think that makes in any way, shape or form what the company did here. It's a New Jersey company declaring bankruptcy in New Jersey based on its corporation, board of directors in New Jersey. I just don't think, there's no news here. So if I can move on to the merits. Mr. Quinn, I understand you see an independent way for us to reason through the application of New Jersey law here. I just wanted to test a little bit what you were suggesting about Claxton because the alternative would be at some federal common law. Yeah, but it's like a quick kick federal common law because I think the way that the circuits that have said, yeah, Claxton's diversity. So the forum law doesn't apply sort of its own force, its federal law. But what they basically look to is, they say federal law will borrow the forum law unless there is some distinct federal policy that is sort of very much to the contrary. And so what I would say is, if you had a hypothetical forum that was out on its absolute own and said, we don't care about internal affairs at all and we are a robust jurisdiction and we don't, you know, anybody can come in and mess with our corporations. Hypothetically, I could see that's a case where the federal court applying federal law and looking to Edgar against Mike might say, well, normally we just borrow the sort of the forum law on choice law and beyond with it. But here there's a conflict. So as a matter of federal common law, we'll override it. You know, from the perspective, the narrow perspective of my client in this case, I suppose that the answer that would be most in their interest would be to say, sure, Claxton applies. So it's New Jersey law because that's what we want to apply. But I will genuinely tell you, having looked at the cases on both sides of the circuit split, I think the better reason cases are the ones that say, no, it is federal law, but it's federal common law that would borrow the forum state law in virtually every instance. So the circuit in the, I guess the Payless case does apply Claxton and bankruptcy cases. And you're saying you would not? I would not. I don't think there's a lot, with all due respect to the Eighth Circuit, there's not a ton of reasoning in that case. And I think some of the other circuits that have gone the other way provide a bit more reasoning. I don't want to suggest that this panel would ever want to take the easy way out, but I do think there's also a way of saying, and I think there's one Third Circuit unpublished case that basically says, we don't need to wade into the circuit split because all roads lead to Rome here and all roads lead to New Jersey choice law principles here. So again, you know, I'll leave the question of whether to leave that question for another day to the panel. It's really a three-way split, right? Because I mean, what you're describing seems like it's drawing from the Second and Fourth Circuits, which are applying Claxton, but with the caveat that if there's some overriding federal interest that that's the way it would go. But we also have the Fifth and Ninth Circuit, which are just rejecting outright any application of Claxton and talking about a federal common law. I think you're right in describing the three-way circuit split. In other walks of life, you know, I like circuit splits. I would just say, I think the Second and the Fourth Circuit have the better view of this. But I do think this is an instance where you could adopt any circuit's approach and you would get to New Jersey law. Because even in the Fifth and the Ninth, where they're doing as a matter of pure federal law, boy, I think you'd go right to Edgar against Mike and the Internal Affairs Doctrine and you'd still get to New Jersey law. How do you answer Mr. Hartnett's point that given the timing here and the actions of the company, that there simply wasn't, there wasn't even time for them to follow the procedures that normally would be followed for New Jersey, having the New Jersey court recognize the receiver at a minimum? So, I mean, I think there probably was time. I mean, if you think about the world through, like, obviously at the point all of this is happening, people haven't thought through every one of these issues. But if you accept my worldview, that really the only way a South Carolina receivership order could have any purchase in the New Jersey courts is if the New Jersey courts sort of accepted it and either appointed them as an ancillary receiver or, you know, or appointed a New Jersey ancillary receiver to help. If you accept that worldview, then the first thing they did when they got the first order would have been to run to the New Jersey court the next day. They didn't do that. Now, I'll grant them, they probably didn't think they needed to based on their view of the law. But, you know, now it's time to put our views of the law side by side and see who's right. And I think our view is right. And I think if our view is right, there was an interval of time. But I suppose just to give you my hard, you know, bottom line position, even if there wasn't an interval of time, I don't think it would matter. Because what I think the federal bankruptcy law at some point has to sort of override here. And again, I don't think my clients did anything in the least bit untoward here, because if you think about what happened in practical terms, they get a $29 million judgment. At that time, their view is they had about $80 million in assets. Well, you know, and there were other, lots of other tort suits in the world. And they have a South Carolina court that maybe looks like it's trying to carve out some favorable treatment for that one creditor that's going to suck out more than a third of the total funds in the estate. Under those circumstances, you know, my advice, I'm not a bankruptcy lawyer, but I think my advice to the client would be file bankruptcy as quickly as you can. Otherwise, the South Carolina creditor, this one creditor with the help of the state court and this receiver is going to try to jump to the line and take all the money for themselves. And that's not in the company's best interest. It's not in the best interest of the other creditors. And it's the perfect situation where you need to get to federal bankruptcy court as soon as possible. And then of course, once you get to federal bankruptcy, unless this is some sort of weird Uber receiver that, you know, is completely inconsistent with the internal affairs doctrine, then the bankruptcy code itself tells you what happens, which is under 543, that receiver is supposed to turn over their property to the estate so it can all be concentrated in the estate and every creditor gets a fair shot consistent with the priorities in federal bankruptcy code. I also want to make sure I understand your argument because looking at the order itself, your position is that it's limited to assets, not internal affairs and assets within the state at that. But is it also your position that even if the court had been explicit about taking over and displacing the board of directors, that order simply would have been unlawful? Yes, it's absolutely our position. And, you know, I think the clearer the order is, the more inconsistent it is with the internal affairs doctrine and New Jersey law. And of course, the clearer the intent behind the receivership order is, then the clearer the preemption argument is. I mean, you know, I think it's worth just as an additional hypothetical as you sort of think through the dynamic. If the South Carolina court just issued an injunction forbidding the company from entering federal bankruptcy, I think everybody would have to agree that that's preempted. And we don't have to appeal that through the South Carolina system or anything else. We can file for bankruptcy and that just brushes off us as an obviously preempted order. And the more you think that's effectively what was really going on here, the more preemption sort of rears its head. Now, I think, again, the bankruptcy judge, you know, to his credit, I think was trying, like, you know, almost like reading this order with a little bit of constitutional avoidance and preemption avoidance and Rooker-Feldman avoidance. And I mean, who can blame him? And I do think it's on the face of the order. You can just read it to be a more innocuous order. But I don't think it really helps my friends on the other side to start looking at the hearing transcript and other things to make it sort of like a more robust order, because the more robust the order is, the more it clearly raises problems, either under New Jersey law and internal affairs or under federal bankruptcy principles. So then if we move on to the merits, I mean, I do think that the Emerald case largely decides this case. I think I agree with you, Judge Krauss, is that as this court's cases have moved on in Wilton-Armitage and as other circuits, like the Second Circuit and In re Tronics, have sort of teased out sort of what's the difference between a general and a specific claim, it really gets down to this, you know, idea of the difference between, if you call it derivative or direct, I think it's almost easier, because derivative's got all that baggage from shareholder litigation. It's almost like, is it direct or indirect? And if the claim is indirect in the sense that it sort of runs through the debtor, and it's not a direct claim against the successor itself, because the successor lied to me or produced a product after 2004 and injured me directly, then it's a claim that properly belongs to this state. And I think one of the other things I would really want to emphasize before I sit down is, you know, if you think about all of the way this is going to work as a practical matter, my friends on the other side, to the extent they're before the panel and not asking for Emeril to be overruled, like they have to come here with the assumption that the vast majority of successor claims and all of the alter ego and all of the veil-piercing claims against Brente, all of those are property of the state. But there's this one tail, or maybe two tails, the product line claims and the California claims that are successor claims, but they somehow fall out and are treated differently and allow their clients to jump the line in front of everybody else. And that doesn't work as a doctrinal matter. They're still indirect claims, so I think they are still fully covered by Emeril and Wilton, but it also just doesn't make any practical sense. And if you go back to, you know, the sort of the root of successor liability in New Jersey, that's Ramirez's case, which they cite in their brief and the Emeril decision cites in the opinion, you know, what it basically says the general rule is no successor liability. There are four established exceptions. We're going to create a fifth one. And the idea that, well, four of the exceptions are going to be general, but the fifth one, because it's product line and maybe a, you know, commercial creditor couldn't bring that claim, that that's somehow going to, we're going to treat that as personal and we're going to have the subset of sort of creditors that might be able to bring a product line claim, be able to sort of jump the line and reduce the incentives for Brentag to make a settlement where they, you know, in this case, the settlement's not directly before you, but you can take judicial notice of the fact that there's a settlement where Brentag is kicking in over, you know, half a billion dollars. Well, you know, you're not going to get half a billion dollars into the estate for the benefit of all the creditors if the successor corporation has to know I'm not going to buy piece as to the property of the estate here, I'm going to also have to deal with these product line claims because they're still out there. They're going to, the other creditors are going to get left as a practical matter and that's going to run, I think, contrary to the thrust of Emeril and to the thrust of the bankruptcy court more generally, which is, you know, this stuff really does logically become property of the estate. It should be available for everybody based on the priorities of the federal bankruptcy code and it shouldn't be that just a subset of creditors has some favorable basis if their claim at bottom is a successor liability claim. Obviously, if they have a direct claim, that's different. So, does this cover each and every successor liability claim that could ever be? Is it just a blanket rule that anytime there's a successor liability claim that we're talking about a claim that's necessarily general claim? I mean, I'd like to say yes because I actually think the bankruptcy system would work better if the answer is just definitively yes. My only hesitation is, you know, could some state, you know, in the future come up with some funky concept of successor liability I haven't thought about? You know, I don't know, but I actually think the answer based on all the successor liability claims that I'm aware of is the answer is always yes and I think it's actually better if the answer is always yes because, again, two principal reasons for that. One is if it's really a successor claim, it is going to be indirect in the relevant sense. It's really not going to be because that successor took out a bat and whacked you themselves. It's going to be because the, you know, the debtor or the, you know, the predecessor company did something bad to the person and in that circumstance, if that's the reason you're able to sue this successor, it's an indirect claim. It really belongs to the estate and people should share relatively. And then the other reason that backs it up is a little more of a policy argument, but I don't think, you know, policy arguments are verboten is once you sort of accept that like 90% of the successor claims are going to be general and not specific, the whole system works a lot better if you don't try to carve out some very small subset of successor claims that get treated differently and get to jump the line. That just sort of doesn't seem to me to make any policy sense. What do we do with our own language where we've talked about the debtor could have asserted the claim on his own behalf and you have certain states here like California where that just simply is not the case where because of strict liability, there's differentiations between when the debtor could bring a claim and when it couldn't. Do we just disregard that language and say we're going to look to this, whatever you want to call it, direct, indirect, derivative and leave that aside? So two answers to that, Your Honor, or maybe ultimately three. The first is I actually think you've already cleaned up the language in Wilton-Armitage. I don't think you need to do anything. Like if it were just Emeril, then I might say you have to clean up the language a little bit. But I think Wilton-Armitage did that. I mean, it basically is a nice, clean two-part test. The first one goes to timing and as the court said there, it's an issue of timing and nobody doubts these claims arose pre-petition. So check that box. And then the second box, the second question is just are they general or are they specific or the direct or the indirect? And I think that's the better way to approach it. And then part of it is the reason I think that's a better way to approach because the question of whether these claims existed in sort of under state law, sometimes that can be like a really complicated question and that's better sorted out later when the state's litigating against the successor and trying to say like, we got you dead to rights on these successor claims. And they're like, well, maybe not these or California might not give you that one. That's actually a better time to do it because you need to know what's property of the state at the outset of the process. The second thing I would say is, this question is exquisitely difficult. If you ask the question this way, which I think the way my friends want you to ask it, which is would the company itself have this claim outside of bankruptcy? And if that's the question you're gonna make yourself answer in every one of these cases, you are in a sense, I think almost setting yourself up for difficulty because the way this works in practice is a state can say something loose, like we don't let a corporation pierce its own veil. But that's like, and this court sort of recognized an emerald like, practically that's almost never gonna happen. But you don't really have the state law be put to the test unless you have a situation like a state appointed receivership where the sort of the bad actors or the people that set up the corporation in the first instance are out of the scene. And most of the states, if they actually address the question in the context of a receiver or some other funky situation where it's not the normal situation of the corporation trying to pierce its own veil or saying it's its own alter ego or whatever it is, they generally let the receiver actually do it because they recognize,  once we've had sort of a government mandated sort of change of control or whatever, it makes a lot more sense to allow the receiver to go after those assets. But there are very few state law cases that actually sort of address what I think is really the relevant question. Is there some loose dictum in the state law that says we don't let the corporation sue its own successor or pierce its own veil, but really squarely address the question of, is there any reason we wouldn't let the corporation do this if there's been a change in control in order to preserve assets? And part of the reason there's so little law is as a practical matter, most of the time you do that in federal bankruptcy. And by the time you're in federal bankruptcy, now you've got a federal court making an eerie guess about what the state law is. And I just went through this in a different case involving Minnesota law. And fortunately, the Minnesota law was pretty clear because they'd had some previous Ponzi schemes and some previous state law receivers, so you could actually kind of isolate what I think is the relevant interval. But that's not going to happen in most of these cases. And that's, I think, reflected in the parties. My friends on the other side are very confident California law wouldn't allow these successor claims. And I look at those California cases and I don't think they'd say that at all. And so I think, you know, the alternative they're offering you is to essentially every bankruptcy have like a whole bunch of exquisitely difficult state law questions confront the bankruptcy judge right at the threshold. And I think the better reading and the one that's more consistent with Wilton is, no, it's pretty simple. Two questions, both really questions that are mostly federal law questions, frankly, like ultimately. And question one, timeliness. Question two, general or specific, direct, indirect, direct, derivative, however you like to phrase it. And then you decide those questions and then you're off to the races. And then the parties can sort of debate about the scope of this. And whatever the recovery is, it'll be a recovery for the state that's shared equally by everybody. And you avoid that. Comfortably within Section 541 as well, because I get your point that it squares nicely with Emerald. It's a nice way of Wilton coming together. Does it work well with the legal or equitable interests of the deterrent property language of 541 where Emerald seems to be grounding itself? I think it does. I think if you were like uncomfortable with the textual grounding in 541A, I think that's the only reason to look to 544A. I mean, you know, we didn't raise that initially in the bankruptcy court. We would be very happy if you decided this case based on Emerald and in our favor and didn't need to reach the 544A question. But like, you know, if you're really sort of hung up on like, you know, I mean, I sort of think you can get there under 541A, but I think I understand the thrust of the question. And if you really thought you couldn't get there under 541A, I think you could get there under 544A. It's up to 544A. It's not as if we see 544A invoked anywhere or a lot. I mean, to Judge Ambrose's point, it shows up in one specific provision. We don't sort of see courts reaching to it as the alternative. So should that give us pause as well? If it gives you pause, it should give you the pause that motivates you to read 541A a little more capaciously. But it seems a little unfair to my clients if you're going to read 541A just in a very sort of, you know, kind of narrow way. And then you're going to get to 544A and you're going to say, well, it's clearly destructive and the text sure seems like it gives you a lot more than avoidance power. But that's not the way courts have typically read it. So we'll ignore the text. It seems to be pretty helpful to you. I mean, it seems like, you know, if you wanted to be just like as hypertextualist as you could be, you might get to the result that we went under 544A. But I think, you know, if you want to be a little more capacious on 541A, then I think you don't need to get to 544A. But I don't see a world where we should lose because, you know, you read 541A. Hypertextualism is fighting words, but I'll let that pass. Usually for me too. But I will say that's why I said hyper. You mentioned something that earlier a few minutes ago that said that a bankruptcy judge is hit with myriad state law issues. And that's true. As we used to say back where I grew up, ain't no doubt about it. But it basically is a judge trying to determine what the parties have bargained for pre-petition and what legal rights and entitlements state law gives you. Bankruptcy will interfere with the remedies oftentimes. Right. But not the entitlements. And so it comes back to the Claxton issue. If the goal is, if parties have disputes that arise in bankruptcy and a judge is trying to figure out the law that should apply to the legal entitlements and equitable entitlements that occur outside of bankruptcy, why wouldn't Claxton be a permissible way of looking at that similar to what the 8th Circuit did in Palos? So I guess what I would say is, and maybe I'm not fully appreciating the question, but like, you know, I mean, Claxton... I'm just trying to look at the overall picture and trying to fit this in. Right, right. And what I, you know, but obviously, you know, Claxton speaks to the choice of law rule. And then once you get to the choice of law rule and you say, OK, it's New Jersey, then there are subsidiary choice of law questions that are going to arise. I think the answer to the New Jersey choice of law, if it's New Jersey law on the South Carolina order versus the New Jersey corporation, it's super easy to say, yeah, New Jersey choice of law principles gets you to New Jersey law. If you apply New Jersey choice of law principles to some of the underlying claims here, I think there are arguments that for some claims you get to non-New Jersey law. It might be for some of the claims to go to the corporate. Right. You might get to Delaware law. If you have a security agreement that's governed by New York law. Right, and I guess from my answer, like from my perspective, all those questions could be hard. And the point is ultimately applying New Jersey choice of law principles to a bunch of different sort of states. I just don't know why it matters that much whether you get to New Jersey law based on Claxton or based on a sort of, you know, federal policy that generally borrows the state law. And I guess the reason that I think the better answer is that will attribute it to the second and the fourth, which is, you know, federal law, but almost always borrows the state law of the forum, is I can imagine a situation where if it's rigidly the state law that you start having some forum selection issues where, you know, people are filing bankruptcy in weird places because they're really trying to get it, take advantage of that forum's state choice of law principles. So it's really only the state law with respect to choice of law, is it not? Yeah, but even then, I can imagine some, you know, and maybe I'm just imagining things, but I can imagine a state that has very unusual choice of law principles. And then that ends up being a favored bankruptcy forum for reasons that have nothing to do with kind of the convenience of the parties or the sophistication of anyone. I mean, it just seems like I'd rather keep in my back pocket the possibility of a federal override, especially because if I go back to Claxton and I look at... Although the code is a federal override with respect to remedies, for example. It is, it is. But even on choice of law, and again, like maybe I'm just overly worried, but to my way of thinking, you know, a rule that says, because if I go back and read Claxton, I mean, it really is tethered to sort of diversity jurisdiction. It's tethered to policy concerns about forum shopping in that are kind of unique to diversity. And so I think, all right, you know, it's a federal question. Logically, choice of law should be sort of federal, but, you know, you don't like to develop like federal common law of choice of law out of whole cloth. So my way of thinking is the best solution is you borrow the foreign law, but you keep in your back pocket the possibility of a federal override if there's something really weird or idiosyncratic. Other than the bankruptcy code, what would a federal, what would be an example of a federal override? So I think, honestly, the best example that comes to mind, maybe just because I'm thinking about this case is if some state just said, you know, we just don't have the, we're the one state in the union that doesn't have an internal affairs doctor. I mean, that's so embedded into our system and the Supreme Court in Edgar against Mike, you know, sort of said without being very specific about where the law was coming from. You don't interfere with the internal affairs. Yeah. And it would be something that's kind of that bedrock. So maybe it's more of a theoretical concern than a real concern. But I can't imagine at least one situation where there's a choice of law principle that I really would want. I mean, I suppose you could go beyond bankruptcy. Let's say federal aviation law, for example. But I'm just trying to think in terms of choice of law. Where does Claxon take you a field outside of where you otherwise would end up? So I think there are, you know, they're going to be circumstances where like, you know, most states, you know, I mean, I, there is, I think there are circumstances where, you know, choice of law principles in most states would take you to something other than the foreign state. You know, if most of the facts and circumstances help happen somewhere else, both the substantive law and the choice of law in some states, I think, would go to a different state. But if there was some state that had sort of a particularly chauvinistic choice of law regime where it's like, no, we always have our law be the law for the choice of law purposes. Then I don't know why in a federal aviation case, you'd necessarily want to be stuck with that idiosyncratic choice of law rule just because of the forum rule when the justification for the forum rule really goes back to diversity jurisdiction. And I hope that's helpful. And, you know, and I guess I'll, I mean, obviously, it's a complicated issue because you have a tripartite split. Yes. And, you know, and that's why there is some attraction to simply saying, we'll leave that for another day where it might matter. And then we don't have to talk about like hypothetical cases where it would matter. We wait till a case where it really matters. But I think this is, there's such a strong impulse behind the internal affairs doctrine. And I think if I heard it right, I'll be corrected if I heard it wrong. But I think the parties agree that New Jersey law should apply here. And if it does, I think we do real well on the motion to dismiss. If we can go back just briefly to successful liability claims, we've had an evolution in the way we in this circuit have articulated the rule. But it's also different than the way the other circuits have talked about it being indirect or there being some, whether it can be directly traced or secondary effects. Is there any meaningful difference between the different articulations among the circuits when it comes to the second part of our Emerald Test? I don't really perceive, I mean, I think they're all going to the same thing, which is direct versus indirect. And I think that's the best way to sort of capture it. And I think some of the cases have talked about facts available to every creditor and things like that. And I think that's part of what leads to some of the confusion because I don't ultimately think, like if a state says we're only going to allow tort creditors, not commercial creditors, to pierce the veil, I wouldn't think you'd say, all right, then all of a sudden, those become specific claims to the tort claimants and not general claims because they're still absolutely indirect claims. They still logically belong to the state. Or like another hypothetical that I've thought of, it's like, you know, if it turns out you've got, like, you know, people from two states and one of the states just idiosyncratically doesn't allow any veil piercing or something, like the veil piercing claims of the claimants from the state that allows veil piercing would still be general claims, even though they wouldn't be available to the claimants in the state that is governed by a law that doesn't allow veil piercing at all. So I think, like, the general versus specific, like, works for some of the cases, but I really think that, you know, and I think Wilton Armitage says this very well. And then I think the Second Circuit and Ray Tronick says this pretty well. It's really whether the claim necessarily kind of runs through the debtor or whether it's really a direct claim against the successor. That seems to me to be the best way to capture it. So the rubric, back to what you said, almost at the outset, direct versus indirect would be a better way of looking at it. That's what that's, as I've thought about it, that seems to me to be the best way to capture it. And I think that's in, you know, in small part, because I think if you say derivative versus direct, I think you mean the same thing, but you take some of the baggage from what's a derivative claim and that drives people crazy in other contexts. OK. Thank you, Your Honors. I just make a few, hopefully, brief points. Just sticking with what you, what was just being discussed, I think going back to where, why are we asking these questions about direct, indirect, or whatever the test is? It's because the estate at the end of the day is what we're trying to understand, 11 U.S.C. 541A1. And it is defined to be all legal or equitable interests of the debtor in property as of the commencement of the case. So the question really at the end of the day is not, is it more convenient to sweep in more claims out there to make a more efficient bankruptcy, but is this actually property of the debtor or not? I reference the state law. That's where that came out of. I would direct your attention in Wilton-Armenthal. That was a case where someone else, not the trustee, was trying to bring a fraudulent transfer case, a fraudulent conveyance action that would have been brought by a creditor, but something that harmed the debtor was to try to recoup money into the debtor's estate. That's essentially aligned with the types of claims that the code has said are general nature. It said those are the ones that actually are being given to the trustee to pursue. And no doubt Wilton's an easier case. Yeah, that is. But Emeril was still quite good law. Sorry, Your Honor. I think that's why it wasn't like Wilton was trying to revise. I mean, at least I didn't read Wilton to be that we're going to go and revise Emeril. What they were doing was talking about the points in that case that were most relevant, which was, okay, is this a general or specific claim? Because this is something that definitely harms the debtor. It was taking fraudulent transfer funds out of the debtor. And is it going to benefit everyone? So I don't think Wilton revised what actually happened in Emeril. It applied Emeril to those facts. And then Tronics, which is the Second Circuit case, likewise, recognized that a claim is a general one. It could be brought by any creditor of the debtor. So I think that just reaffirmed the understanding of what that meant. And the reason why is the slippery slope of going away from what the code is asking us to find out, which is, is this an interest of the debtor or not? And it's hard to understand how you could see a product line, strict liability claim under New Jersey law. I should point that out. This is not some crazed theory that has no tie to New Jersey. These are tort claimants that are trying to avail themselves of a theory under this state's law of New Jersey, where the state has decided that it's appropriate to make a third-party libel to the extent they continue to manufacture products that were harming someone by a prior... It's not even clear to me that that's actually best conceived of as successor liability, as opposed to sort of a direct liability that's taken on by a successor who continues to manufacture the product. So that's the problem at some level with trying to read too much into any specific application. And it's more important to look at the framework, which actually comes out of the code and the underlying principles of state law. I also just wanted to respond to the notion that somehow the receiver was seeking to maximize a recovery for one tort claimant. That, again, is not true and belied by what... I really do commend the transcript. It's only a few short pages of the appendix, but you really do get a sense that this is not a crazed judge in South Carolina trying to act beyond her authority. She is concerned about the representations being made to her by the defendant in that case about who is controlling this company, how many assets do they have, only a small pile of cash, or a lot of insurance policies that actually could be used. So I commend you to JA 418 to 427, because when you read that and see what she thought she was doing, argue about whether that was too much under South Carolina law or not, she was trying to protect the assets for everybody, and she appointed the receiver as an officer of the court to do that. That's what she thought she was doing, and I think that is intended to the due regard by the courts here. So is it your position that the fiduciary duties of the receiver flow to any and all claimants around the country, not just on this plant? Yes, you're right, and she believes this is what the South Carolina court believed, that it was able to access the intangible assets, including the insurance policies that under South Carolina law, including the Supreme Court case there, those were properly considered within the state, all of them, and then she told them to go investigate the policies and go figure out what's there and what's available, and I'm going to put someone in charge of this, and I trust to do that, and that's what she thought she was doing. It may have been, again, the right way to challenge that would have been to appeal it like other of these companies have that don't like the receivers, but instead, again, and that's why it's important to look at this transcript, there was a, you know, WCB led her to believe they were participating in that process, and at the same time, there was no chance for Protopopos to go and get the receivership. He had every reason to believe, based on that transcript, that he had the power that he believed he had. He was writing letters back and forth in that period, trying to get some engagement from WCB and was getting brushed off, but this is a due, an order of another state's court that's due respect, but at the end of the day, I would just say that applying the precedents as we find them, the statutes as we find them, this, there were a couple of shortcuts here to try and maybe do something that the debtor thought was efficient or that the lower court thought was efficient in terms of resolving this up and tying it up in a bow. Bankruptcy is messy, and in this case, for both the jurisdiction, meaning not subject matter jurisdiction and for the summary judgment were two shortcuts that should not have been permitted. When you have a $29 million judgment against you and you perceive that you're in deep financial distress, why wouldn't bankruptcy be the very first thing you think of? And so if you're in Mr. Potapoff's position, the very first thing you would want to counter if you could. Is the concern about thwarting the bankruptcy? In fact, the first thing you think about as a debtor is I need a safe haven at least to try to sort things out by way of in connection with all these various collection actions that are going to come down the pike. So bankruptcy allows me to do that. And if you're on the other side, you would know the same thing and you would want to take action to try to impede that if you can, maybe having an ancillary receiver appointed in New Jersey, maybe having, as the counsel here did try, to have the order specifically refer to the ability to file a bankruptcy or control who can file a bankruptcy. But that didn't happen. The court didn't grant that latter request and no one requested an ancillary receiver. Your Honor, I believe that, I mean, the court did deny the reconsideration motion and the transcript of the hearing in a couple of places made clear that Proto-Potapoff believed he did have that power. It definitely the power to control the assets. He believed he had the power to at least assess them before any bankruptcy was filed by some other group. And it was certainly not a preemption or a public policy issue because no one was saying this company could not go into bankruptcy. What was happening in South Carolina was non-transparency with the court about the asset picture. That's what she said. I want to know what the asset picture is. Not being upfront about the available billions or millions of dollars of insurance that was there. It was a effort to make it look like insolvent company and she didn't believe it. But if you're in the position of WCD, you're trying to buy time in order to get your ducks in a row in order to file for bankruptcy. I don't know of anything, was anything said at the hearing that was directly contradictory to filing for a bankruptcy such as we have no intention of filing for bankruptcy or anything like that. I saw nothing in the transcript. There was notable silence, but certainly not candor with the court about what was happening, which was not going to be submitting a response to a proposed order in a week but filing a bankruptcy case that was in conflict with what the court understood to be the scope of the receivership order. So I'm not trying to make a case. I don't know the situation of the counsel with a different counsel in South Carolina from here. So I'm not making any accusations against the attorney. What I am saying is that the client, the company was on the one hand playing along in South Carolina, leading the court to believe there was no reason for more urgent action, leading the receiver to believe there was no need for more urgent action. And on the other hand, getting ready to and then filing a bankruptcy before anyone down there could do anything about it. That's what happened. And I think the question for this court is, you know, what do we do about it? And I think our answer is that this is an unauthorized bankruptcy filing and it should be dismissed or alternatively. I mean, I think that is the beginning and end of it. But this was not done in good faith. This was actually done to avoid another court order. And there are assets here. This was not at the situation of insolvency. I'm going back to more than a quarter century ago, but when we were involved in these type of cases, the first thing you would say is, hey, go to the court, don't lie to the court. But don't bring up any red flags, just be as silent as you can. We're getting everything ready to file in New Jersey. If you're asked, maybe you answer it, and we'll file quicker. But we're going to file in New Jersey come hell or high water. And the faster we can do it, the better. I don't have an obligation to tell a court in South Carolina that I'm thinking of filing in New Jersey unless somebody asks the direct question of me. There's nothing wrong with that. That's not bad faith. I'd be remiss. I don't want to come to your honor and do what is appropriate practice. I do think the record in this case shows an unfortunate leading the court along in South Carolina to believe that the interests were protected. The receiver certainly had, I think, no reason to think that the bankruptcy was going to be filed imminently. He was worried about that, came to the court and said, that's my worry. The court said, that's my worry too. That's why I so quickly entered the order. And a lot of the arguments we've just heard here about was it too broad and South Carolina crazy, those are all arguments that were made during that reconsideration hearing. And the judge said, well, I'm going to continue my order. Everyone seems to think, except, I guess, everyone understood that that's what that meant. Yeah, my guess is that the concern that the judge had, because she was a former member of the South Carolina Supreme Court, is that the statute here talks about assets of a foreign entity within the state of South Carolina. It's tough to go beyond that. And I think that seemed to be her concern, but I don't know for sure. Well, this is different in the two orders that are up in front of the South Carolina Supreme Court. Both were limited to that. In that case, the judge, she doesn't just, this is not like a maniograph machine where it's the same order every time. In those two cases, it was limited to the insurance assets because there was less of a concern there about what was going on. Here, the record is clear that she felt like she was not getting straight answers from WCD and had a real concern that some other group was going to file for bankruptcy and take the assets out of the control of someone that could be trusted before there was a chance to get a full asset picture. That's what she thought she was doing. That's what everyone left the hearing. And the reason why there was the week, there was actually a part of a transcript on JA 424 where there was a question of like, should we, Mr. Protopappas, the receiver, I have held further action so that the court could consider the post-trial motion. I'm ready to start tomorrow. But, oh no, I don't have to worry. We'll get a week now to put in the proposed order. I don't have to start tomorrow. So I appreciate your point about no one has to give away all the secrets when you're in court. There is a duty of general candor. And I think in this case, again, not with respect to the attorney, but with respect to the overall conduct of trying to get out of South Carolina and do it in a way that kind of avoided what was happening down there. I think the point is there's a conflict between an order there, what they're doing here, and the right way to have resolved it would be to have sought a stay in a few days. Is your argument in essence that an order that authorizes the management of assets is authorizing bankruptcy because bankruptcy is just about management of assets, that it's not a matter of internal affairs of the corporation? I don't think in every case, Your Honor. I think each of these, we've looked at the different receivership orders and we have like a few cases in our brief that we've cited where the court did not use the word bankruptcy, but the court, the underlying court making the receivership order didn't say bankruptcy, but it was understood to encompass that power. We've cited those cases. And so the question really is on this specific order, what was meant by it? And to the extent the initial order appeared to be very broad, but possibly unclear, her oral comments made clear that that is what she thought she was doing. It's not in every single case, but in this case, at a minimum, she believed that her order precluded some other group, be it the board of directors or someone else filing for bankruptcy on behalf of WCD. But is there any line that you're drawing as to the affairs of the corporation? Or is it that a local court can appoint a receiver of a foreign corporation that can handle all of the affairs of the corporation? I actually think that's a limitation. It could be possible under South Carolina, but you're saying of a foreign corporation. The foreign corporation without limitation. I think we don't have to reach that even in this case, because the question, at least if one of those powers, to the extent one of the powers is to file for bankruptcy, that is what she intended to and thought she was precluding with the order. Is that a power of managing the affairs of the corporation? Or is that managing of assets? It's bound up with the asset power. And that's exactly why the first day declaration and the request for WCD for the bankruptcy court's intervention was help us have the appropriate administration of our assets. It's bound up in that. And so I do think there's no way to read the two orders to be consistent. And I think there's been a comment of the judge below trying to read it away as a straight remark. It wasn't a straight remark. It meant what it said. Maybe it was wrong under South Carolina law. That's something that the courts of appeals are contending with there. But it certainly meant what it said. And there's nothing in New Jersey law that prevents that from taking effect. And I would just, I know it's gone over, but I would just direct you to our brief. We did at page 20 of our reply brief talk about how New Jersey law does recognize out-of-state receivers. So there's not a general, you know, presumption against them. It just depends on the case. Okay. Thank you, Your Honor. All right. We thank both counsel for excellent briefing and argument today. And we will take.